IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRUCE HENRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-797-RAH |
| | ) | [WO] |
| RON ABERNATHY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

In August 2021, Bruce Henry's wife gave birth to their son.  But because Henry has a prior conviction for possession of child pornography, Alabama law prohibits him from having overnight visits or living with his son until his son turns 18—no matter how low Henry's risk of recidivism may be.  This prohibition allows no exceptions and contains no mechanism by which Henry can request relief from the prohibition.

In late 2021, Henry filed this lawsuit under 42 U.S.C. § 1983 challenging the constitutionality of portions of Alabama's Sex Offender Registration and Community Notification Act, ALA. CODE § 15-20A-1 *et seq.* (ASORCNA). Specifically, he challenges the provisions that operate to prohibit him and certain

other adult sex offenders from residing with their minor children based solely on a qualifying conviction.

Pending before the Court is Henry's motion for a preliminary injunction, in which he seeks to be allowed to reside with his child while this case is pending. (Doc. 30.)  The Court held a two-day evidentiary hearing, in which Henry presented testimony from three expert witnesses, and the Defendants presented testimony from one expert witness.  Henry did not testify, nor did his wife or probation officer. Henry's motion is ripe for decision.

## II.   JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Henry may be entitled to a preliminary injunction if he demonstrates: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) the threatened injury to him outweighs the harm the injunction would cause the Defendants; and (4) the injunction would not be adverse to the public interest.  *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

2

Where, as here, "the [State] is the party opposing the preliminary injunction, its interest and harm merge with the public interest," and thus the third and fourth elements are the same. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder* 556 U.S. 418, 435 (2009)). A preliminary injunction is "'not to be granted unless the movant clearly established the "burden of persuasion"' for each prong of the analysis." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (citation omitted). Henry, as the movant, must satisfy his burden on all four elements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). Failure to show any one of the four elements is "fatal." *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

## IV.   BACKGROUND

"When ruling on a preliminary injunction, 'all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true.'" *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1063 (M.D. Ala. 2021) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)).

### A. Statutory Background

ASORCNA has been described as "the most comprehensive and debilitating sex-offender scheme in the nation." *McGuire v. Marshall*, 512 F. Supp. 3d 1189,

1198 (M.D. Ala. 2021).  As relevant here, § 15-20A-11(d)(4) prohibits adult sex offenders convicted of a "sex offense involving a child" from having overnight visits or residing with their children.

One arrives at this prohibition via two layers of exceptions to the statute's general rule.  The statute provides that "[n]o adult sex offender shall reside or conduct an overnight visit with a minor."  ALA. CODE § 15-20A-11(d).  A minor is "[a] person who has not attained the age of 18."  *Id.* § 15-20A-4(13).  However, an exception to the prohibition applies "if the adult sex offender is the parent, grandparent, stepparent, sibling, or stepsibling of the minor."  *Id.* § 15-20A-11(d).

That exception itself has five exceptions, including, as relevant here, if the adult sex offender has been convicted of "any sex offense involving a child."  *Id.* § 15-20A-11(d)(4).[1]  Section 15-20A-4(27) defines "sex offense involving a child" as "[a] conviction for any sex offense in which the victim was a child or any offense involving child pornography."  A child is "[a] person who has not attained the age

---

[1] The other exceptions where an adult sex offender cannot reside or conduct overnight visits with their minor child, grandchild, stepchild, sibling, or stepsibling are (1) the adult sex offender's parental rights "have been or are in the process of being terminated as provided by law," *id.* § 15-20A-11(d)(1); (2) the adult sex offender has been convicted of any sex offense in which the victim was "any of the minor children, grandchildren, stepchildren, siblings, or stepsiblings of the adult sex offender," *id.* § 15-20A-11(d)(2); (3) "[t]he adult sex offender has been convicted of any sex offense in which a minor was the victim and the minor resided or lived with the adult sex offender at the time of the offense," *id.* § 15-20A-11(d)(3); and (4) "[t]he adult sex offender has been convicted of any sex offense involving forcible compulsion in which the victim was a minor," *id.* § 15-20A-11(d)(5).

of 12." *Id.* § 15-20A-4(2).[2]   No one disputes that Henry's child pornography

conviction qualifies as an "offense involving child pornography" within the meaning

of § 15-20A-4(27).

ASORCNA defines "overnight visit" as "[a]ny presence between the hours of

10:30 p.m. and 6:00 a.m." *Id.* § 15-20A-4(14).  Additionally, it defines "reside" as

being "habitually or systematically present at a place," which "shall be determined

by the totality of the circumstances, including the amount of time the person spends

at the place and the nature of the person's conduct at the place." *Id.* § 15-20A-4(20).

ASORCNA further defines "reside" as follows:

> The term reside includes, but is not limited to, spending more than four
> hours a day at the place on three or more consecutive days; spending
> more than four hours a day at the place on 10 or more aggregate days
> during a calendar month; or spending any amount of time at the place
> coupled with statements or actions that indicate an intent to live at the
> place or to remain at the place for the periods specified in this sentence.

*Id.*  Thus, until his child turns 18, § 15-20A-11(d)(4) prevents Henry from being

present in the home where his child resides in the following circumstances: (1) at

any time between the hours of 10:30 p.m. and 6:00 a.m.; (2) for more than four hours

a day on three consecutive days; (3) for more than four hours a day on ten or more

---

[2] Thus, if a sex offender has committed a sex offense against a victim who was under 12 years old, the offender is prohibited from residing with or conducting an overnight visit with their own minor child until their minor child turns 18.

days during a calendar month; and (4) in any other circumstance in which the parent is "habitually or systemically present" at the minor's home.  *Id.*

These residency restrictions apply to Henry for life.  The statute contains no mechanism by which an offender can challenge or petition for relief from the restriction.[3]

The Alabama Legislature's stated finding is that residence restrictions further "the primary governmental interest of protecting vulnerable populations, particularly children."  *Id.* § 15-20A-2(5).

## B. Factual Background

In 2013, Henry was convicted, pursuant to a guilty plea, of one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), in the United States District Court for the Northern District of Alabama.  Over 300 images and two videos of child pornography had been located on Henry's computer and other electronic devices.  One video depicted a prepubescent female performing oral sex on an adult male, who also inserted a finger into the female's vagina.  Another

---

[3] ASORCNA allows a sex offender to petition for relief from the residency restriction in § 15-20A-11(a) "during the time a sex offender is terminally ill or permanently immobile, or the sex offender has a debilitating medical condition requiring substantial care or supervision or requires placement in a residential health care facility."  *Id.* § 15-20A-23(a).   Section 15-20A-11(a) prohibits adult sex offenders from establishing or maintaining a residence "within 2,000 feet of the property on which any school, childcare facility, or resident camp facility is located." However, neither § 15-20A-23 nor any other ASORCNA provision allows a sex offender to petition for relief from the residency restriction in § 15-20A-11(d), which prohibits adult sex offenders from residing or conducting overnight visits with a minor.

video depicted a nude prepubescent female performing oral sex on a dog; a partially clothed adult male could also be seen in the video.   According to Henry, his possession of child pornography was the result of a pornography addiction and is not indicative of pedophilia.

Henry was sentenced to 70 months imprisonment and 60 months supervised release with special conditions.  One special condition required him to participate in the United States Probation Office's "computer restriction/monitoring program." (Doc. 21 at 5 in *United States v. Henry*, 4:12-cr-550-KOB (N.D. Ala.).)  This program may include a provision prohibiting Henry from possessing or using "any computer or portable electronic device which has the capability of communicating with any other electronic device without the prior approval of the probation office." (Doc. 27 at 1–2 in *Henry*, 4:12-cr-550-KOB (N.D. Ala.).)  Another special condition prohibited Henry from having "any unsupervised, one-to-one contact with any children under the age of 18 other than his own children."  (Doc. 21 at 5 in *Henry*, 4:12-cr-550-KOB (N.D. Ala.).)

After he was released from prison in March 2018 and began supervision, Henry completed a qualified Sex Offender Treatment Program (SOTP).  Since that time, Henry has voluntarily continued counseling to further address the addictive behaviors that he says contributed to his offense.  Prior to his 2013 conviction, Henry had no history of sexual offenses, involving a child or otherwise.

On February 4, 2020, Henry's probation officer swore out a petition to revoke Henry's supervised release.  The petition was based upon two events.  First, on July 26, 2019, Henry admitted during a polygraph interview that he used an Amazon Fire TV Stick to access the internet and view pornography.  "[D]eception was indicated" when the polygraph examiner asked if Henry had viewed child pornography.  (Doc. 27 at 3 in *Henry*, 4:12-cr-550-KOB (N.D. Ala.).)  Henry's electronic devices were seized and forensically examined, and no images of child pornography were located on any devices.  However, many of the pornographic images Henry viewed had titles indicating that they were of young or teenage females.  Additionally, in a follow-up polygraph on August 21, 2019, Henry admitted to "actively seeking out images of children posed in sexual positions and images of teen girls."  (Doc. 27 at 3 in *Henry*, 4:12-cr-550-KOB (N.D. Ala.).)

The second event giving rise to the revocation petition occurred on or around December 2019.  At the end of December 2019, Henry's wife left her phone unattended while she took a shower.  Noticing that the screen was not yet locked, Henry used his wife's phone to "do a Google search for transgender porn and looked at pornographic images for about 10 minutes."  (Doc. 27 at 5 in *Henry*, 4:12-cr-550-KOB (N.D. Ala.).)  Henry disclosed this incident to Jerome Wells, his sex offender treatment provider, on January 2, 2020.  However, Henry did not disclose the incident to his probation officer during a home visit conducted on January 8, 2020.

Instead, the probation officer learned about it from Henry's January 9, 2020 monthly supervision report.

The revocation court declined to revoke Henry's supervised release. However, the court extended the length of his supervised release from 60 months to a total of 96 months. Thus, Henry's supervised release will end in March 2026.

In 2018, Henry married his current wife. His wife gave birth to their son on August 4, 2021. Due to ALA. CODE § 15-20A-11(d)(4), Henry is prohibited from "residing" or "conducting an overnight visit" with his child. As a result, the child is in the physical custody of Henry's wife. Thus, the statute also effectively prohibits Henry from residing with or conducting overnight visits with his wife, unless she relinquishes physical custody of the child. But for § 15-20A-11(d)(4), Henry would reside and have overnight visits with his child.

Henry alleges that he does not pose a meaningful risk to his own child if allowed to reside or have overnight visits with him. He further alleges that neither an individual's commission of a sex offense in which the victim was a child, nor an individual's commission of an offense involving child pornography, by itself indicates that the individual poses a danger to their own child if allowed to reside or have an overnight visit with their child. According to Henry, it is possible to determine, to a reasonable degree of scientific certainty, an individual's risk of committing a recidivistic sexual offense against their own child.

Henry currently resides in Tuscaloosa County, Alabama.

**C. Henry's § 1983 Lawsuit**

On November 21, 2021, Henry sued, in their official capacities, Defendant Ron Abernathy, Sheriff of Tuscaloosa County, Alabama; Defendant Hays Webb, District Attorney of Tuscaloosa County, Alabama; and Defendant Steve Marshall, Attorney General of the State of Alabama (collectively, the Defendants). Henry asserts that ALA. CODE § 15-20A-11(d)(4) violates the First Amendment right of intimate association, both facially and as applied to him (Count 1); the Fourteenth Amendment right to the care, custody, and control of one's children, both facially and as applied to him (Count 2); and the Fourteenth Amendment right to equal protection, both facially and as applied to him (Count 3). Henry seeks declaratory and injunctive relief, as well as attorney's fees and costs.

On March 8, 2022, Henry filed a Motion for Preliminary Injunction, in which he asks the Court to permit him to conduct overnight visits and reside with his minor child while this lawsuit is pending. In support of his Motion, Henry attached reports from Dr. Keith Hersh, Mr. Jerome Wells, and Dr. Barry Burkhart. The Defendants filed responses in opposition to which they attached a report from Dr. Matthew DeLisi, and Henry filed a reply. The Court held an evidentiary hearing on the Motion on August 16–17, 2022.

**D. Evidence Presented at Preliminary Injunction Hearing**

At the evidentiary hearing, Henry offered testimony from three expert witnesses: Dr. Hersh, Mr. Wells, and Dr. Burkhart.  The Defendants offered testimony from one expert witness: Dr. DeLisi.  The witnesses' testimonies are summarized below.

**1.  Dr. Hersh**

Dr. Hersh is a psychologist whose private practice specializes in the evaluation and treatment of people who have committed sexual offenses and have other sexual behavior problems.  He has seen approximately 1,300 patients in that capacity.  He has also worked with the United States District Court for the Middle District of North Carolina to provide sex offender treatment and conduct sex offender evaluations.   He has a Ph.D. in clinical psychology and wrote his dissertation on treatment completion and recidivism among incarcerated sex offenders.  Dr. Hersh was offered and admitted as an expert in the areas of recidivism of sex offenders, psychology of sex offenders, risk assessment of sex offenders, and the efficacy of treatment of sex offenders.

According to Dr. Hersh, recidivism "refers to the commission of a new criminal offense after the individual received an official legal sanction, such as a conviction, for a previous offense." (Doc. 57 at 37.) He testified that research shows adult male sex offenders released in the United States commit new sex offenses at

the rate of 3% to 6% over three years.  Dr. Hersh also opined that an individual's risk of recidivating decreases over time as the offender remains offense-free out in the community.  According to federal government research, 1.9% of offenders in the sample were charged or convicted of a new sex offense within the first year of release.  At year two, 1.6% had been charged with a new sex offense since year one. At year three, 0.9% had been charged with a new sex offense since year two.  Thus, according to Dr. Hersh, a sex offender's risk of sexual recidivism is at its highest at the beginning of the time the sex offender is released back into the community.  He clarified that this research comprised sex offenders as a whole, including offenders who committed contact sexual offenses (such as sexual assault on an adult or sexual abuse of a child), noncontact sexual offenses against an individual victim (such as voyeurism or offenders who have exposed themselves), and possession or distribution of child pornography.  He opined that recidivism rates vary by category, and sex offenders who have a prior contact offense pose a greater risk of reoffending compared to other categories of sex offenders.  Research surveying a sample of offenders in the United States convicted of child pornography possession reveals that between 1.4% and 4.6% of those offenders are charged or convicted of a new sex offense of any type within three to five years of their release into the community. This research further shows that 1% to 2% of such offenders will be charged or convicted of a contact sex offense against a child within three years of release.

Dr. Hersh also testified as to the efficacy of sex offender treatment. He opined that treated sex offenders' recidivism rates are reduced by 25% to 33% where the treatment follows cognitive behavioral principles and is supervised by psychologists.

Dr. Hersh explained that because there are significant differences among child pornography offenders, it is best to evaluate an individual's risk rather than try to evaluate the risk posed by "child pornography offenders" as a group. Assessing a child pornography offender's individual risk requires consideration of the offender's criminal history, psychological functioning, and social history.

Dr. Hersh discussed several risk assessment tools that are used to assess an individual's risk of sexual recidivism: the Static-99R, the Child Pornography Offender Risk Tool (CPORT), and the Risk of Sexual Abuse of Children (ROSAC). The best-known tool is the Static-99R, in which the assessor scores the offender on ten different items. Higher scores indicate a higher risk of sexual recidivism.

For child pornography offenders, professionals use the CPORT, which contains seven items scored by the assessor. Each item is scored a 0 (no) or a 1 (yes). Validation information for the CPORT has been published in peer-reviewed journals. Similar to the Static-99R, higher scores on the CPORT indicate greater risk factors and a greater tendency to commit new sex offenses compared to individuals with lower scores. The CPORT assesses, among others, whether the

13

offender has a sexual interest in children.  According to Dr. Hersh, "[s]exual interest in children has been found to be one of the most robust indicators of recidivism rates." (*Id.* at 48.)  Specifically, one of the CPORT items assesses whether there is an indication of pedophilic or hebephilic interests.  A pedophilic interest is a sexual interest in prepubescent children, and a hebephilic interest is a sexual interest in pubescent children.  If the offender admits having a sexual interest in children, this CPORT item is scored a 1.  The CPORT also contains a sub-instrument, the CASIC, which assesses factors associated with sexual interest in children where the offender does not admit such interest.

The ROSAC assesses adult males who have already been convicted of sexual abuse of a child and the risk those males pose to a specific child in a specific home, and what safety measures might be required to allow contact between the potential abuser and potential victim if contact is considered reasonable.  Dr. Hersh opined that it is possible to assess the risk an individual offender poses to a specific child.

On cross-examination, Dr. Hersh acknowledged the existence of the "dark figure of sexual crime," which refers to sexual offenses that are committed but do not come to the attention of the authorities and thus do not lead to charges or convictions.  (*Id.* at 55.)  He acknowledged personally encountering examples of the dark figure of sexual crime, such as clients in treatment reporting previously unknown, unreported sexual offenses that occurred prior to the conviction leading

to treatment.  Dr. Hersh disagreed that a sex offender with a low Static-99R score poses a greater risk than a person who has never been convicted of a sex offense. According to Dr. Hersh, such a low-scoring offender is "indistinguishable" from a person who has never been convicted.  (*Id.* at 57.)  Turning to the CPORT, Dr. Hersh offered a "critique": the CPORT is a relatively new instrument and has not gone through the full range of validation studies that the Static-99R has gone through.  (*Id.* at 58.)  Dr. Hersh also admitted that the CASIC sub-instrument does not account for the number of pornographic images in the offender's possession.  Although he opined that the number of images is unrelated to the offender's recidivism rate, he admitted that the volume of material consumed by an offender could be evidence of a sexual interest in children.  Dr. Hersh acknowledged that persons convicted of a sexual offense are more likely to commit another sexual offense than persons convicted of a non-sexual offense.  When asked whether a sex offender who has been repeatedly noncompliant with his supervised release terms posed a heightened risk of recidivism, Dr. Hersh acknowledged that such noncompliance was a source of concern but maintained that one has to consider the totality of the person to truly assess their risk.

On redirect examination, Dr. Hersh explained that both the Static-99R and the CPORT establishes an individual's baseline risk of sexual recidivism.  However, to assess the individual's risk, one has to also consider and weigh the individual's risk

factors and protective factors.  According to Dr. Hersh, research indicates that an individual's risk can be assessed based upon the existence of risk factors and protective factors.

### 2.  Mr. Wells

Mr. Wells is a counselor whose private practice mainly focuses on treatment for individuals who have committed a sexual offense or need treatment for a sexual dysfunction.  He has been hired by the federal and state governments to provide treatment and administer risk assessments to sex offenders.  He provided sex offender treatment to Henry following Henry's conviction for possession of child pornography.[4]  Mr. Wells was offered and admitted as an expert in the administration of risk assessment tools to sex offenders and the treatment of sex offenders.

Mr. Wells testified that he has known Henry for four years and met with him approximately 150 to 200 times.  According to Mr. Wells, Henry has not revealed or indicated deception regarding unknown contact offenses or other sex offenses on any polygraph examination.  In Mr. Wells's professional opinion, Henry is a low risk of being a contact or hands-on offender.

---

[4] At the evidentiary hearing, counsel for the Defendants asked Mr. Wells whether it posed an ethical problem for him to be retained by Henry as an expert witness while providing Henry treatment and being under an obligation to report certain information about that treatment to the probation office, to which Mr. Wells responded "[N]o."  (Doc. 57 at 76.)  Defendants' counsel argued that these issues "ought to go to [the] weight" of Mr. Wells's testimony (*id.*), although counsel did not explain or cite any authority in support of this argument.  At this stage, the Court has not considered the potential ethical issue raised by the Defendants, but the Defendants are not precluded from re-raising it later.

Mr. Wells acknowledged Henry's two instances of noncompliance with his supervised release terms, explaining that Henry disclosed those instances to him. According to Mr. Wells, Henry completed his sexual offender treatment program (SOTP) in June 2019, and Mr. Wells and Henry's probation officer determined and signed off on the completion. He said he continued to see Henry after the SOTP was completed, and Henry also voluntarily attends support groups for sex addicts.

Mr. Wells testified regarding three risk assessment tools he administered to Henry: the Static-99R, the CPORT, and the ROSAC. Henry scored a -1 (negative one) on the Static-99R. Mr. Wells explained that a -1 corresponds to below average risk of reoffending. Mr. Wells opined that Henry is a very low risk to reoffend due to the protective factors in place, including his family, his support system, being an active member of his faith community, holding the same job since his release, and attending support groups.

Mr. Wells also administered the CPORT to Henry. According to Mr. Wells, Henry scored a 1, which is a baseline assessment indicating Henry poses a low risk of sexual recidivism. Henry scored a 0 on Item 5 of the CPORT (indications of pedophilic or hebephilic interests) and a 2 on the CASIC sub-instrument. On the CASIC, Henry received one point because he had possessed child pornography videos and another point because his child pornography activity spanned two years. Mr. Wells explained that the CPORT did not consider Henry's supervised release

violations to be a risk factor for recidivism because the violations were self-reported. After individually evaluating Henry, Mr. Wells determined that Henry poses a below average risk among those offenders who score a 1 on the CPORT.

Mr. Wells also administered the ROSAC to Henry for Henry and his own child.  Based on the ROSAC, Mr. Wells determined that Henry poses a low risk to his child and can live with his child without risk.

On cross-examination, Mr. Wells acknowledged that the Static-99R is designed for contact, hands-on offenders and not child pornography offenders, and he explained he administered the Static-99R to Henry because he was asked to. Mr. Wells did not recall Henry's August 2019 admission that he was still actively seeking out images of children in sexual positions, and Mr. Wells admitted he did not address this admission with Henry during the course of Henry's treatment. Moreover, the fact that Henry had been actively seeking images of children in sexual positions was not taken into account in Henry's CASIC exam.   Mr. Wells admitted that such a person has a sexual interest in children.  Additionally, Mr. Wells testified that he either did not know or could not recall that Henry's supervised release had been extended.  Mr. Wells acknowledged that Henry's supervised release violations occurred after he completed the SOTP.

On redirect examination, Mr. Wells opined that Henry's supervised release violations did not indicate a problem with Henry's treatment; instead, Mr. Wells

opined that Henry's self-reporting the violations demonstrates the treatment is working.  Mr. Wells further opined that Henry is not a pedophile and that a person who looks at child pornography is not necessarily a pedophile.  In Mr. Wells's opinion, Henry is addicted to pornography, and his viewing child pornography is a result of this addiction.  According to Mr. Wells, it is a "fairly standard progression" and "in the nature of addiction" for a person addicted to pornography to "end up at child porn."  (Doc. 57 at 133–34.)  Mr. Wells further explained that a person having sexual interest in children does not mean the person will actually act on their interests.  Mr. Wells reaffirmed his opinion that Henry is not a risk to his own child and that Henry would not sexually molest his own child if allowed to live with him.

### 3.  Dr. Burkhart

Dr. Burkhart is a retired clinical psychologist who still works in private practice specializing in the treatment of sex offenders.  He has a Ph.D. in clinical psychology.  Dr. Burkhart was offered and admitted as an expert in the recidivism of sex offenders, psychology of sexual offending, and the psychological and developmental effects of an absent parent on early childhood development.

Dr. Burkhart testified that offenders "who have contact, that is, who commit sexual assault" typically have the highest recidivism rates.  (*Id.* at 156.)  He also testified that the recidivism rate for child pornography offenders is the lowest among sex offenders, and within child pornography offenders, child-pornography-only

offenders (as opposed to offenders who have both child pornography and some contact) have the lowest rate of recidivism.  In Dr. Burkhart's opinion, Henry is a pure "child-porn-observation-only" offender.  (*Id.* at 157.)

Dr. Burkhart testified that it is possible to ascertain an individual offender's risk of reoffending through various risk assessment tools.  He explained that the risk assessment tools, particularly the CPORT, allow psychologists to identify whether persons previously convicted of child pornography offenses are likely to commit additional child pornography offenses, and that the government relies upon these tools in determining whether to release child pornography offenders from confinement.  He opined that the fact of a prior conviction alone is not a reliable predictor for reoffending.  He also opined that, in Henry's specific case, the fact of Henry's child pornography conviction is not a reliable indicator that he poses a risk of harm to his own child.  According to Dr. Burkhart, this is because the recidivism rate for offenders who have completed treatment is "very low"—2%—and additional "inhibitory processes," such as the incest taboo and empathy for one's own child, make it unlikely that an offender would offend against his own child.  (*Id.* at 163–64.)  In Dr. Burkhart's view, Henry poses a less than 2% risk of committing an offense against his own child.  He opined that 1% of child pornography offenders later commit a contact sex offense and that the parent/child relationship between

Henry and his son would be a significant buffer to the possibility of harm directed at the child.

He also testified about the negative effects of an absent parent on children, which he described as "significant." (*Id.* at 168.)  According to Dr. Burkhart, loss of a parent is the highest stress event that can happen to a child.  For boys specifically, having an absent parent increases aggression and criminal behavior.

On cross-examination, Dr. Burkhart testified that sexual interest in children, by itself, is a robust indicator of risk.  He also explained that "guardrails" are needed for sex offenders to have access to children. (*Id.* at 175.)  In a situation where the offender was a father who poses a low risk, as well as individual factors indicating a lower risk; who is continuing in treatment on his own and is doing well in treatment, "who has demonstrated that he even trusts that process enough to risk his incarceration, his subsequent incarceration, that's a circumstance where the guardrails appears to be in place and appear to be working"; Dr. Burkhart opined that he would "probably" rather have that father in the home than not in the home. (*Id.* at 176.)  Referencing research showing that less than 5% of people who identify as a child sex abuse victim ever report to authorities, he acknowledged that there are more victims of contact offenses—and more perpetrators—than records suggest.  He insisted, however, that this has no effect on recidivism statistics.

When asked by the Court what guardrails would need to be in place in Henry's case, Dr. Burkhart identified continuing treatment; Mr. Wells staying in touch with Henry's spouse, since she is the child's other guardian "and the most important person to ensure the child's safety"; and the continued supervision attendant to being on supervised release. (*Id.* at 185.) Dr. Burkhart further opined that, even assuming federal supervision ended, Henry had access to the internet, and Henry elected to no longer go to treatment, he would still recommend that Henry be allowed to live in the home with the child full time. Dr. Burkhart opined that the highest risk possibility for Henry would be a return to porn. He further explained that Henry's "sexual interest pattern is not for boys" and is "clearly predominantly for girls." (*Id.* at 185–86.)

### 4. Dr. DeLisi

The Defendants proffered one expert witness, Dr. Matthew DeLisi. Dr. DeLisi is a professor at Iowa State University where he teaches a variety of criminal justice courses. He is also the coordinator of the criminal justice program in the Department of Sociology and Criminal Justice. Dr. DeLisi has a Ph.D. in sociology with a focus in criminology. He is a self-described "generalist researcher" who has published in different content areas, including criminal careers, offending patterns, homicide offending, and sexual offending. (*Id.* at 191.) He previously served as a pretrial services officer in Colorado, in which he set bond on criminal

defendants after interviewing them; and as a research specialist in the United States Probation and Pretrial Services in the Southern District of Iowa.  Dr. DeLisi has never met or evaluated Henry.

The Defendants initially sought to offer Dr. DeLisi as an expert in several areas, including criminology; sexual offending, including recidivism rates; the dark figure of crime, including in sex offenses; offending patterns, including in sex offenses; recidivism based on behavior on supervised release; and broad criminological issues pertaining to criminal careers and offending behavior.  Henry's counsel objected, arguing that Dr. DeLisi was not an expert in, among others, sex offender treatment, recidivism, or recidivism of sex offenders.  During voir dire by Henry's counsel, Dr. DeLisi acknowledged his deposition testimony from a prior case in which he admitted he would probably not be a desirable expert regarding sex offenders because he is "not a sex offender researcher per se."  (*Id.* at 197.) Following the voir dire, the Court expressed concerns about some of the opinions Dr. DeLisi sought to offer, observing that the opinions appeared to be outside of Dr. DeLisi's areas of expertise.

Ultimately, the Defendants offered Dr. DeLisi as an expert in criminology.[5] Specifically, Dr. DeLisi was qualified to discuss risk factors for crime and the

---

[5] Criminology has been defined as "the scientific study of crime as a social phenomenon, of criminal investigation, of criminals, and of penal treatment."  *Moore v. Kemp*, 809 F.2d 702, 718 n.20 (11th Cir. 1987) (en banc) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY

attributes that go into analyzing crime at a high level of generality. However, Dr. DeLisi was not qualified to assess or perform psychological evaluations of individuals or to opine about Henry individually.

Dr. DeLisi testified that a criminal conviction itself confers a higher likelihood of offending relative to nonoffenders or people who lack a criminal conviction. He further explained that although the risk of reoffending declines over time, it is never the same risk as a nonoffender. He further opined that a person's behavior on supervised release is an important predictor of their risk of offending: if the person was wholly compliant, that would be a protective factor, but if the person has been noncompliant, it would be a risk factor indicating that the person is not ready to desist from offending. Dr. DeLisi explained research showing that 60% to 65% of child pornography offenders showed indications of pedophilia, and that this rate was three times greater than contact sex offenders. That same research indicates that the duration of time a child pornography offender consumed pornography and the number of images or videos consumed are greater indications of pedophilia. According to Dr. DeLisi, research shows that 5% of sex offenders commit rape or sexual assault as a new offense. He testified that some study participants who possessed child pornography reported contact offenses, even if the participants had

---

537 (1976)). Dr. DeLisi described criminology as "the study of the causes, correlates, and control of crime." (Doc. 58 at 11.)

no official criminal justice record of contact offenses.  According to one metanalysis, official data shows that 12% of child pornography offenders commit a contact offense.  Based on other data, including self-reports, the rate is 55%.

## V.   DISCUSSION

Henry seeks a preliminary injunction on his *as-applied* First Amendment and Fourteenth Amendment claims.[6]  At oral argument, Henry indicated that most of the case law on which he relies concerns the First Amendment right to intimate association.  He asks the Court to enjoin the Defendants from enforcing § 15-20A-11(d)(4) against him, thereby permitting him to have overnight visits and reside with his minor son while this lawsuit is pending.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.").  But here, the

---

[6] Regarding the Fourteenth Amendment claims, while it is clear that Henry moved for a preliminary injunction based on his Fourteenth Amendment claim that parents have a fundamental right to the care, custody, and control of their children, it is less clear whether Henry moved for a preliminary injunction based on his equal protection claim.  Even if the Court were to construe Henry's motion as premised upon his equal protection claim, the Court's decision would remain the same.

status quo is that Henry is not living with his child.   Thus, Henry's requested preliminary injunction seeks to disrupt the status quo.

The parties disagree about the legal standards applicable to the resolution of Henry's motion.   Regarding the appropriate level of scrutiny, Henry argues that § 15-20A-11(d)(4) is subject to strict scrutiny because the provision infringes upon his fundamental rights to intimate association and the care, custody, and control of his child.   Henry argues that, while promoting child safety is a compelling government interest, § 15-20A-11(d)(4) is not narrowly tailored, and that narrow tailoring requires that an adult sex offender undergo an individualized risk assessment before the state can prohibit the offender from living with their child. Conversely, the Defendants argue that rational basis review is appropriate because this Nation's history and traditions do not recognize a fundamental right of sex offenders to reside with their children.   The Defendants contend that a "careful description of the asserted right" is not a parent's right to live with their own child but rather the right of a *convicted sex offender* to live with their own child.  (Doc. 35 at 19–22.)   In the alternative, the Defendants argue that if strict scrutiny applies, § 15-20A-11(d)(4) is narrowly tailored, and no individualized risk assessment is required.

Although § 15-20A-11(d)(4) does not operate to officially terminate Henry's parental rights or limit all contact with his child, it nonetheless severely limits the

time Henry can be present at his child's home.  The provision altogether forbids Henry from being present at his child's home between 10:30 p.m. and 6:00 a.m. These restrictions apply until the child turns 18.  And although ASORCNA allows adult sex offenders in certain circumstances to seek relief from other residency restrictions, *see* ALA. CODE § 15-20A-23(a), the statute provides no mechanism by which Henry can seek relief from the prohibition on living with his child.  The provisions apply to Henry based solely on one fact: he was convicted of child pornography possession in 2013.

The Court is inclined to conclude that § 15-20A-11(d)(4) severely burdens Henry's fundamental rights and thus is subject to strict scrutiny[7]; however, at this

---

[7] This inclination is based upon, among others, decisions from another judge in this district and the Alabama Court of Criminal Appeals concluding that the residency restriction is subject to strict scrutiny, which this Court finds persuasive. *See Doe #1 v. Marshall*, No. 15-CV-606-WKW, 2018 WL 1321034, at *7 (M.D. Ala. Mar. 14, 2018) (rejecting the state's proffered "careful description" of sex offenders' asserted right to familial association; explaining that the plaintiffs asserted their right to live with extended family, which the Supreme Court "enshrined as fundamental," and declining to create "an 'except-for-sex offenders' rule"); *Herring v. State*, 100 So. 3d 616, 622–25 (Ala. Crim. App. 2011) (analyzing earlier version of ASORCNA and concluding that residency restriction is subject to strict scrutiny).

The Court's inclination is also informed by decisions of numerous courts of appeals that have considered the legality of restrictions on a criminal defendant's association with their own children as a condition of supervised release.  In cases where the defendant had a sex offense conviction—even a conviction for a contact sex offense against a child—courts nonetheless recognized that special conditions may interfere with the defendant's fundamental right to maintain their familial relationship with their children "only in compelling circumstances." *See, e.g.*, *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. 2014) (citation omitted) (distinguishing between general restrictions on contact with children and restrictions on contact with the defendant's own children, the latter of which is "subject to stricter scrutiny").  These courts rejected arguments that a defendant's sex offense conviction, standing alone, was sufficient to justify limiting the defendant's contact with their own children—even where the supervised release term was for a single-digit term of years. *See, e.g.*, *id.* (in case where defendant was convicted of failure to

stage the Court need not make this determination.  The Court will assume without deciding that § 15-20A-11(d)(4) is subject to strict scrutiny; that narrow tailoring requires an individualized risk assessment; and that if Henry is not a risk to his child, then he prevails (or, for present purposes, is substantially likely to prevail) on the merits of his claims.

Henry's position is unclear as to which party bears the burden at the preliminary injunction stage with respect to risk: must Henry show that he is not a risk to his child, or must the Defendants show that he is a risk?  Because Henry seeks a preliminary injunction that would disrupt the status quo, the Court finds that in this posture, Henry bears the burden of demonstrating that he does not pose a risk to his child if allowed to live with him.  The Court expresses no view as to which party would bear the burden for purposes of the constitutional analysis at summary

register as a sex offender where the defendant had been convicted in 2001 for committing lascivious acts with a child, specifically forcing a child under the age of 12 to engage in oral and sexual intercourse with him and fondling the genitals of another female child, vacating special condition of 5-year supervised release term limiting the defendant's ability to be at his children's residence and to be alone with them without supervision; concluding that the record lacked compelling evidence supporting restrictions on the defendant's contact with his own children and explaining that the prior conviction was "too remote in time, standing alone, to provide compelling evidence justifying infringement upon [the defendant's] right of familial association"); *United States v. Quinn*, 698 F.3d 651, 652 (7th Cir. 2012) (Easterbrook, C.J.) ("Rules that allow public officials to regulate family life . . . call for special justification, and lifetime regulatory power is hard to support when the defendant has not been convicted of crimes against his family or other relatives."); *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006); *United States v. Del Valle-Cruz*, 785 F.3d 48, 51–52, 62–63 (1st Cir. 2015); *United States v. Worley*, 685 F.3d 404, 408 (4th Cir. 2012); *United States v. Voelker*, 489 F.3d 139, 154–55 (3d Cir. 2007).

judgment or at a trial on the merits, assuming strict scrutiny applies and narrow tailoring requires an individualized risk assessment.

The Court also fails to discern a clear argument from Henry explaining the quantum of risk of harm that can be tolerated here.  Put differently, in balancing an offender's interest in living with his family against the interest in protecting children from harm, what is an acceptable amount of risk of harm to a child?  Five percent?  One percent?  Less?

The Court need not decide the exact quantum of risk because on this record, Henry has not demonstrated his entitlement to the extraordinary remedy of a preliminary injunction for two independent reasons: (1) he has not demonstrated a substantial likelihood of success on the merits, and (2) he has not persuaded the Court that the balance of harms weighs in favor of granting a preliminary injunction.

## A. Substantial Likelihood of Success on the Merits

Henry has not demonstrated a substantial likelihood of success on the merits because he has not shown, at this stage and on the evidence presented, that he is not a risk to his child if allowed to live with him.  True, Henry presented testimony from two experts who opined that Henry does not pose a risk to his child and should be able to go home, as well as expert testimony that child pornography offenders have low recidivism rates for sex offenses generally and contact sex offenses specifically. The Defendants' expert, who did not evaluate Henry and was not qualified to opine

about the topics about which Henry's experts testified, could not rebut Henry's experts' testimony that Henry did not pose a risk to his child and should be able to go home.  Nor did the Defendants' expert rebut Henry's experts' testimony that child pornography offenders have low recidivism rates.  However, the Court is not required to accept Henry's experts' conclusions even in the absence of countervailing evidence from the Defendants.  *See Mims v. United States*, 375 F.2d 135, 140 (5th Cir. 1967) (explaining that "questions of the credibility and weight of expert opinion testimony are for the trier of fact," and "such testimony is ordinarily not conclusive even where it is uncontradicted")[8]; *Negron v. City of Miami Beach*, 113 F.3d 1563, 1570 (11th Cir. 1997) (observing that "the district court as factfinder was free to reject [the] expert testimony, even if it was uncontradicted" (citing *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1469–70 (11th Cir. 1989))).

Here, the Court declines, at this stage, to accept Henry's expert testimony as conclusive for two independent reasons.  First, as will be discussed further below, two details about Henry's background are troubling to the Court, and Henry's experts did not provide testimony sufficient to assuage the Court's concerns. Second, the Court heard no testimony from Henry, his wife, or his probation officer,

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

which creates a significant evidentiary gap at this early stage of the litigation given the extraordinary relief Henry requests.

Starting with Henry's background, of particular concern to the Court are (1) the volume and nature of the child pornography images and videos Henry possessed that led to his conviction, and (2) Henry's August 2019 admission that he was still actively seeking out images of children in sexual positions.  First, Henry's indictment and ultimate conviction for child pornography possession did not involve a mere handful of images; rather, Henry possessed over 300 images and two videos of child pornography.  Dr. Hersh admitted that the volume of material consumed by an offender could be evidence of a sexual interest in children, and both Dr. Hersh and Dr. Burkhart opined that sexual interest in children is a robust indicator of recidivism risk.  The Court is also troubled by the videos Henry possessed, one of which depicted an adult male engaged in hands-on sexual abuse of a prepubescent child and another of which depicted a prepubescent child engaged in an act of bestiality with a partially clothed adult male also visible on screen.  While all child pornography is abhorrent and disturbing, the Court is especially troubled that Henry possessed videos depicting hands-on sexual abuse of prepubescent children. Although Mr. Wells testified that Henry's possession of videos was taken into account in the CPORT, neither Mr. Wells nor Henry's other experts addressed what role, if any, depictions of hands-on sexual abuse play in determining the recidivism

risk for child pornography offenders generally or Henry specifically. Because Henry bears the burden of persuading the Court that he is entitled to the extraordinary remedy of a preliminary injunction, this evidentiary gap cuts against Henry at this stage, and it undermines the weight afforded to the experts' opinions that Henry does not pose a risk to his own child if allowed to live with him.

Second, the Court is troubled by Henry's August 2019 admission that he was still actively seeking out images of children in sexual positions, as well as the dearth of evidence regarding the impact this fact may have on the question of whether Henry poses a risk to his child if allowed to live with him. Although such images may not technically qualify as child pornography, they still raise concerns about Henry's risk to his child, specifically whether he has a sexual interest in children. Indeed, Mr. Wells acknowledged that a person who actively seeks out images of children in sexual positions has a sexual interest in children. And as noted above, both Dr. Hersh and Dr. Burkhart agreed that sexual interest in children is a robust indicator of recidivism risk. True, the expert testimony was not specific about the relationship between sexual interest in children and recidivism risk, including the nature of the recidivating offense(s)—*i.e.*, child pornography possession, a contact sex offense, or another offense. But this lack of specificity cuts against Henry at this stage, as he bears the burden of persuasion. Additionally, although Mr. Wells also opined that sexual interest in children does not mean the person will actually act on

their interest, this vague statement does not inform the Court about *Henry's* likelihood (or not) to act on this interest.  And although Mr. Wells opined that Henry is not a risk to his child, would not sexually molest his child, and should be allowed to live with his child, Mr. Wells did not recall Henry's August 2019 admission, nor did he address it with Henry during Henry's treatment, nor did he account for it when he administered the CASIC risk assessment tool to Henry.  Mr. Wells's failure to address this issue with Henry in treatment or to account for this issue in the CASIC undermines the weight owed to Mr. Wells's opinion that Henry does not pose a risk to his child.

Moreover, neither Dr. Hersh nor Dr. Burkhart expressly addressed Henry's 2019 admission or how, if at all, it factored into their assessment that Henry is not a risk to his son; and if they believe it does not indicate a risk, why they hold that belief.  As to Dr. Burkhart, the failure to address this issue undermines the weight owed to his opinion that Henry is not a risk to his child.  And although Henry's admission was made approximately three years ago and approximately two years prior to Henry's child's birth, no evidence was presented that Henry has stopped seeking out those images; if so, when he stopped; and how those facts might bear on Henry's current risk to his child if allowed to live with him.  This evidence—and the lack of it—weighs against a finding at this stage that Henry does not pose a risk to his child.

Other evidentiary gaps militate against a finding at this stage that Henry does not pose a risk to his own child.  Notably absent from the evidence Henry presented was testimony from Henry, Henry's wife, or Henry's probation officer.  It should go without saying why Henry's testimony would be crucial for the Court to hear in considering whether to grant a preliminary injunction.  Before disrupting the status quo and allowing Henry, a convicted sex offender who has been noncompliant with the terms of his supervised release, to reside with his one-year-old child on an incomplete evidentiary record, the Court would have preferred to hear from Henry himself about, among others, the circumstances surrounding his child pornography conviction, the circumstances surrounding his supervised release violations, whether he still actively seeks out images of children in sexual positions, and overall for the Court to be able to assess Henry's demeanor and credibility.  Henry's wife is also an important witness.  The wife is the child's other parent and caregiver who, according to the Complaint, would also be residing in the home with Henry and the child.  According to Dr. Burkhart, Henry's wife is the most important person to ensure the child's safety.  Additionally, it was the wife's cell phone that Henry used to view pornography in December 2019, which prompted Henry's probation officer to seek revocation of Henry's supervised release and ultimately resulted in Henry's supervised release period being extended.  The Court would have preferred to hear from Henry's wife about these matters, among others.  Finally, Henry's probation

officer is also an important witness.  The probation officer has supervised Henry during his supervised release and, moreover, recommended that Henry's supervised release be revoked as explained above.  It would have been helpful to hear from Henry's probation officer about these matters, among others.

The Court does not suggest that, if Henry, Henry's wife, or Henry's probation officer, or all or some combination of them had testified, the Court would grant the preliminary injunctive relief Henry seeks.  Nonetheless, these evidentiary shortcomings prevent the Court from accepting Henry's expert testimony as conclusive, and they underscore that Henry has not persuaded the Court that he has a substantial likelihood of success on the merits.

Because Henry has not shown a substantial likelihood of success on the merits, his motion is due to be denied on this basis alone.  *See ACLU of Fla.*, 557 F.3d at 1198.

## B. Balance of Harms

Even if he had demonstrated a substantial likelihood of success on the merits, Henry has not shown that the balance of harms weighs in his favor.

In so concluding, the Court finds persuasive the Seventh Circuit's discussion in *Darryl H. v. Coler*, 801 F.2d 893 (7th Cir. 1986), about the district court's unique and important task in assessing whether to grant a preliminary injunction.  In *Coler*, the Seventh Circuit affirmed the district court's denial of a preliminary injunction

sought by parents who challenged the constitutionality of the state's procedure for investigating child abuse, specifically the state's policy permitting a caseworker to conduct a physical examination of a child's body for evidence of abuse. *Id.* at 894–95. The Seventh Circuit explained that the district court's task in assessing whether to grant a preliminary injunction is to "*minimize errors*: the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose." *Id.* at 898 (citation omitted). The court went on to explain:

> The judge must try to avoid the error that is more costly in the circumstances. That cost is a function of the gravity of the error if it occurs and the probability that it will occur. The error of denying an injunction to someone whose legal rights have in fact been infringed is thus more costly the greater the magnitude of the harm that the plaintiff will incur from the denial and the greater the probability that his legal rights really have been infringed. And similarly the error of granting an injunction to someone whose legal rights will turn out not to have been infringed is more costly the greater the magnitude of the harm to the defendant from the injunction and the smaller the likelihood that the plaintiff's rights really have been infringed.

*Id.* (citation omitted). In affirming the denial of a preliminary injunction enjoining the state's policy, the court held that the district court did not err in concluding that the potential harm to the defendants and the public interest if the injunction issued outweighed the potential harm to the plaintiffs if it did not. *Id.* at 904–05. The Seventh Circuit explained that if it affirmed and the plaintiffs ultimately prevailed at trial, "some children will have been subjected to unreasonable, and therefore

unconstitutional, physical examinations." *Id.* at 904.   On the other hand, if it reversed the district court, then "it is likely that some child abuse would go undetected and some innocent lives unprotected." *Id.* (citation omitted).   Ultimately the Seventh Circuit could not "fault [the district court] for avoiding the most costly error of all—loss of human life." *Id.* at 904–05.

Similar logic applies here.  If the Court denies the preliminary injunction and Henry ultimately prevails at trial, he will have been unconstitutionally deprived of the ability to reside with his child.  Moreover, the Court acknowledges the expert testimony that Henry's child would be harmed as a result of not having a father figure at home during the child's formative years.  These harms are not insignificant. But on the other hand, if the Court grants the preliminary injunction, Henry's one-year-old child will face the risk of residing with an adult sex offender who, in the Court's view, possesses some demonstrated and long-term sexual interest in children, as evidenced by both the facts underlying Henry's child pornography conviction in 2013 and his August 2019 admission that he was actively seeking out images of children in sexual positions, the latter of which suggests a sexual interest in children according to Henry's own expert.  And sexual interest in children is a robust indicator of recidivism risk—also according to Henry's own experts.  On this record, Henry has not met his burden of demonstrating that the harm he faces outweighs the harm to the Defendants and the public interest.  For this additional

and independent reason, Henry has not demonstrated his entitlement to the extraordinary remedy of a preliminary injunction.

The Court has misgivings about § 15-20A-11(d)(4). However, those misgivings may be addressed at a more mature stage of the litigation process. *See id.* at 904. In an effort to "avoid the error that is most costly in the circumstances," *see id.*, the Court concludes that the motion for preliminary injunction is due to be denied.

## VI.   CONCLUSION

This case presents difficult questions about the Constitution's demands when balancing a parent's right to live with his child with the state's interest in promoting child safety. The Court will resolve those questions in due course. For the time being, the Court is not persuaded that it should disrupt the status quo and grant Henry the preliminary injunction he seeks.

Accordingly, Henry's Motion for Preliminary Injunction (Doc. 30) is DENIED.

**DONE** on this the 19th day of December, 2022.

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE