UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRUCE HENRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00797-RAH |
| | ) | |
| RON ABERNATHY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I. Background ...........................................................................................................1

II. Summary Judgment Standard ............................................................................3

III. The Statute .......................................................................................................5

IV. The Constitutional Harm ................................................................................7

V. Harms to Third Persons ..................................................................................11

VI. Standard of Review and Burden of Proof .....................................................13

VII. Question Presented .......................................................................................14

VIII. The Risk Posed by Persons Convicted of a Sex Offense ..........................15

   A. General Risk .................................................................................................15

   B. Risk Posed by Child-Pornography Offenders .............................................16

   C. Time to Redemption ....................................................................................17

   D. Reduction Through Treatment .....................................................................20

   E. The Effect of Unreported Sexual Offenses .................................................20

      i. The Prolific Offender ...............................................................................20

      ii. No Effect on Time to Redemption ..........................................................21

      iii. Research Not Applicable ........................................................................22

      iv. The Rate of Undetected Child Sexual Abuse ..........................................23

      v. Conclusion ...............................................................................................24

IX. Risk Assessment of Persons Convicted of Sexual Offenses .........................24

X. Risk Posed by Mr. Henry ...............................................................................28

XI. The Statute Does Not Meet Strict Scrutiny ......................................................30

XII. Equal Protection ................................................................................................33

XIII. Conclusion........................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..........................................4, 5

*Bazemore v. Jefferson Capital, Sys., LLC*, 827 F.3d 1325 (11th Cir. 2016) ..........14

*Celotex, Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................3, 14

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)...............................34

*Cordoba v. Dillard's, Inc.*, 419 F.3d 1169 (11th Cir. 2005) ...............................4, 31

*Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005) ..................................... 13, 34

*Doe v. Strange*, No. 2:15-cv-35161, 2016 WL 1079153
(M.D. Ala. Mar. 18, 2016) .....................................................................................13

*Dunn. v. Blumstein*, 405 U.S. 330, 342 (1972) .......................................................34

*Gaines v. Wardynski*, 871 F.3d 1203 (11th Cir. 2017) ..............................................7

*Garczynski v. Bradshaw*, 573 F.3d 1158 (11th Cir. 2009) ........................................4

*Herring v. State*, 100 So. 3d 616 (Ala. Crim. App. 2011) ......................................13

*Johnson v. Mortham*, 915 F. Supp. 1574 (N.D. Fla. 1996) ....................................34

*Lyng v. Castillo*, 477 U.S. 635 (1986) .......................................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...............4

*McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir. 1994)..................................................7

*McGuire v. Marshall*, 512 F. Supp. 3d 1189 (M.D. Ala. 2021) ...........................7, 8

*Moore v. East Cleveland*, 431 U.S. 494 (1977)................................................ 11, 30

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................. 13, 29

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) .............................................7

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989) ...................................13

*Stanley v. Illinois*, 405 U.S. 645 (1972) ...................................... 7, 9, 32, 36

*Troxel v. Granville*, 520 U.S. 57 (2000) ............................................7, 36

*United State v. Quinn*, 698 F.3d 651 (7th Cir. 2012).......................................... 14, 37

*United States v. Bear*, 769 F.3d 1220 (10th Cir. 2014) ...........................................14

*United States v. Davis*, 452 F.3d 991 (8th Cir. 2006).......................................... 14, 32

*United States v. Del Valle-Cruz*, 785 F.3d 48 (1st Cir. 2015) .......................... 14, 32

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) ...........................9, 13

*United States v. Volker*, 489 F.3d 139 (3d Cir. 2007). .............................................14

*United States v. Williams*, 553 U.S. 285 (2008) .........................................10

*United States v. Worley*, 685 F.3d 404 (4th Cir. 2012) ...........................................14

**Alabama Statutes**

§ 12-15-301 .............................................................................32

§ 12-15-319(a)(4) ...................................................................32

§ 13A-12-192 ............................................................................5

§ 15-20A-10 ...............................................................................33

§ 15-20A-11(a) ............................................................................6

§ 15-20A-11(d) ............................................................................5

§ 15-20A-11(d)(4) ........................................................... passim

§ 15-20A-19(b) ..........................................................................26

§ 15-20A-23(a) ......................................................................6, 26

§ 15-20A-24 ...............................................................................6

§ 15-20A-26(e) ................................................................................................26

§ 15-20A-4 ............................................................................................ passim

§ 20-15A-2(5) ..............................................................................................30

15-20A-11(d)(4) ...........................................................................................11

18 U.S.C. § 2252A(a)(5)(B) ........................................................................1

GA. CODE ANN. § 42-1-14(2) (2021) ..........................................................26

N.C. GEN. STAT. § 14-208.12A(a1)(3) (2019) ...........................................26

N.Y. CORRECT. § 168-l 6(a)-(c) (2019) .....................................................26

R.I. Gen. Laws § 11-37.1-11(5) (2022) .....................................................26

S.C. CODE ANN. § 23-3-463(3)(E)-(F) (2022) ...........................................26

## **Rules**

FED. R. CIV. P. 56(c) .......................................................................................3

## **Other Authorities**

Admin. Office of the U.S. Courts Probation and Pretrial Services Office, *Overview of Probation and Supervised Release Conditions*, Ch. 3 § 18 (Nov. 2016) .........25

BLACK'S LAW DICTIONARY (7th ed. 1999) ................................................10

Blumstein, A., and Nakamura, K., *Redemption in the presence of widespread criminal background checks*, CRIMINOLOGY, 47(2), 327 (2009) ........................17

Kurlychek, M.C., Brame, R., & Bushway, S.D., *Scarlet letters and recidivism: Does an old criminal record predict future offending?*, CRIMINOLOGY & PUBLIC POLICY, 5(3), 483 (2006) .....................................................................17

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ...............10

## **Rules**

FED. R. CIV. P. 56(c) .......................................................................................3

COMES NOW Plaintiff Bruce Henry, by and through undersigned counsel, and does respectfully submit the following Brief in Support of his Motion for Summary Judgment

## I. Background

Plaintiff Bruce Henry was convicted in 2013 on one count of violating 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography). Exhibit 1 at p. 1. He was sentenced to a seventy (70) month term of incarceration and sixty (60) months supervised release. *Id.* The court directed that upon release Mr. Henry was not to "have any unsupervised, one-to-one contact with any children under the age of 18," but expressly exempted his own children from this limitation. *Id.* at 5. Mr. Henry served his incarceratory sentence and was released to the supervision of the Northern District of Alabama on March 23, 2018. Exhibit 2 at p. 100.

Mr. Henry has no arrests or convictions for any other offense. Exhibit 3 at p. 47:4–18. Post-release testing shows that Mr. Henry has never committed a contact sex offense against a child (Exhibit 4 at p. 2) and his treatment provider – to whom Mr. Henry was referred by U.S. Probation – assesses that he is very low risk to reoffend.[1] Exhibit 5 at pp. 284:10–285:13; Exhibit 6 at p. 3. This opinion is

---

[1] As explained in detail *infra*, in this context "very low risk" means that there is a less than 1% chance that Mr. Henry will commit any contact sexual offense. Mr. Henry has completed his "time to redemption."

confirmed by two other qualified psychologists. Exhibit 7 at pp. 192:8–193:22; Exhibit 8 at p. 7; Exhibit 9 at p. 32.

Since his release, Mr. Henry has maintained steady employment (Exhibit 3 at pp. 29:4–30:6); become an active member of a faith community – attending church regularly and doing volunteer work (*Id.* at pp. 33:2–34:11); completed the "Good Lives Model" – a cognitive behavioral therapy-based model for treatment of sex offenders (Exhibit 5 at pp. 172:1–11, 175:10–176:6; Exhibit 3 at p. 73:6–12); and begun attending weekly meetings of sex addicts anonymous (SAA) (Exhibit 3 at p. 35:3–17). He has gotten married, and, on August 4, 2021, he had a son. Exhibit 3 at pp. 20:5–21:2; Exhibit 9 at p. 13:7–13.

None of this matters under Alabama law. Alabama Code § 15-20A-11(d)(4) prohibits Mr. Henry from living with his son (or even visiting with him outside the limitations imposed by the statute). Having been convicted of possessing child pornography Bruce Henry is forever barred from living with his own minor children. The ban lasts for life and there is no appeal. Nothing Mr. Henry can do after conviction will allow him to live with his wife and minor child – ever.

Bruce Henry filed this lawsuit on November 29, 2021, pursuant to 42 U.S.C. § 1983. He seeks a declaratory judgment that this lifetime prohibition on living with his own child violates the First and Fourteenth Amendments to the United States Constitution as well as denies to him the equal protection of the law. He

further seeks injunctive relief barring Defendants from enforcing this law against him and the other parents to whom it applies. The Court has denied Defendants' Motions to Partially Dismiss Plaintiff's Claims (Docs. 20, 25) and discovery is now complete. Doc. 83. The issues are ripe for summary judgment.

As shown below, Defendants have not adduced evidence in this case sufficient to meet their burden of proving that ALA. CODE § 15-20A-11(d)(4) survives strict scrutiny. On that basis, Plaintiff respectfully requests that summary judgment be entered in his favor.

## II. Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex, Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this initial burden, the burden shifts to the non-moving party to "come forward with

specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).

"[T]he mere existence of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no <u>genuine</u> issue of <u>material</u> fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added). A dispute is "genuine" when the evidence is such that a reasonable factfinder could resolve the dispute in favor of the non-moving party. *Id.* at 248. A fact is "material" if its resolution could affect the outcome of the case. *Id.* "The substantive law will identify which facts are material." *Id.*

To defeat a properly supported motion for summary judgment, the non-moving party must present more than conclusory allegations, speculation, or a 'mere scintilla' of evidence. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment.") (emphasis in original); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("A 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.").

If the evidence adduced by the non-moving party is "merely colorable, or is not significantly probative, summary judgment must be granted." *Anderson*, 477 U.S. at 249–50.

### III. The Statute

Under ALA. CODE § 15-20A-11(d)(4), any person convicted of "any sex offense involving a child" may not "reside or conduct an overnight visit with a minor" – including their own children.[2] "Sex offense involving a child" is defined as "any sex offense in which the victim was a child or any offense involving child pornography." *Id.* § 15-20A-4(27). A child is "[a] person who has not attained the age of 12." *Id.* § 15-20A-4(2). But "child" pornography is broader – encompassing any "obscene matter that contains a visual depiction of a person under the age of 17 years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct." *Id.* § 13A-12-192.

Section 15-20A-11(d)(4) contains no exceptions and there is no mechanism by which a parent may seek relief from the restriction – regardless of the individual

---

[2] ALA. CODE § 15-20A-11(d) provides that "[n]o adult sex offender shall reside or conduct an overnight visit with a minor." An exception to this prohibition applies under ALA. CODE § 15-20A-11(d) "if the adult sex offender is the parent, grandparent, stepparent, sibling, or stepsibling of the minor." However, this exception does not apply if the adult sex offender has been convicted of "any sex offense involving a child." *Id.* § 15-20A-11(d)(4).

circumstances of the individual or of the conviction.[3] Thus, a 19-year-old teenager convicted of a sexting offense with his 16-year-old girlfriend is treated the same way as an individual actively producing pornography involving pre-pubescent children. The restriction applies for life. *See* ALA. CODE § 15-20A-24. An individual convicted of any qualifying offense at 19 cannot live with his or her own child at age 50 – regardless of demonstrated rehabilitation.

Under the statute, "overnight visit" is "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m." ALA. CODE § 15-20A-4(4). There is no exception for the purpose of the visit or the length of the visit nor does it matter whether the parent is alone with the child. To "reside" means to be "habitually and systematically present at a place." *Id.* The term "reside" includes, "<u>but is not limited to</u>, spending more than four hours a day at the place on three or more consecutive days; spending more than four hours a day at the place on 10 or more aggregate days during the calendar month; or spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence." *Id.* § 15-20A-4(20) (emphasis added); *see also McGuire v. Marshall*, 512 F. Supp. 3d 1189, 1201 (M.D. Ala.

---

[3] In contrast, a registrant may seek relief from other aspects of Alabama's sex offender restrictions. *See* ALA. CODE § 15-20A-23(a) (allowing petition for relief from the residency restriction of ALA. CODE § 15-20A-11(a)).

2021) (noting that the specific circumstances listed in § 15-20A-4(20) are "illustrations rather than limitations on the definition [of 'reside']").

Under the statute, "whether a person is residing at a place shall be determined by the totality of the circumstances." *Id.* Thus, a parent subject to the statute is subject to arrest and prosecution if law enforcement officials believe he or she is spending too much time with their child.

## IV. The Constitutional Harm

The First Amendment protects the right of intimate association – "the freedom to choose to enter into and maintain certain intimate human relationships." *Gaines v. Wardynski*, 871 F.3d 1203, 1212 (11th Cir. 2017). This freedom is a "fundamental element of personal liberty" and encompasses the right to raise one's children and cohabitate with one's relatives. *See Roberts v. United States Jaycees*, 468 U.S. 609, 619 (1984); *see also McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994) (noting right of "cohabitation with one's relatives"). A statute that "directly and substantially interfere[s] with family living arrangements" burdens this right. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

Relatedly, "the oldest of the fundamental liberty interests" protected by the Due Process Clause of the Fourteenth Amendment is "the interest of parents in the care, custody, and control of their children." *Troxel v. Granville*, 520 U.S. 57, 65 (2000); *see also Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (collecting cases and

noting "[t]he Court has frequently emphasized the importance of family").

On its face, ALA. CODE § 15-20A-11(d)(4) imposes substantial burdens on each of these rights. The statute prevents a parent subject to its provisions from being with their child: (1) <u>at any time</u> between the hours of 10:30 p.m. and 6:00 a.m.; (2) for more than four hours a day on three consecutive days; (3) for more than four hours a day ten or more times during the month; and, (4) <u>in any other circumstance</u> in which the parent is "habitually or systematically present" at the home of their child or at any given location with the child. (Emphasis added.) *See McGuire*, 512 F. Supp. 3d at 1201 (noting "catch-all provision" of ALA. CODE § 15-20A-4(20)). As to the First Amendment right, the statute literally means that the parent cannot live with their family – thus "substantially and directly interfering with family living arrangements." As to the Fourteenth, the parent cannot assume "custody" of the child because they cannot be physically present with the child outside the severely proscribed hours. Effectively, the statute relegates the lawful parent of the child to the role of a non-custodial parent with limited visitation.

Separately, ALA. CODE § 15-20A-11(d)(4) raises serious procedural due process concerns.[4] The prohibition on living with one's own child (and, by extension, one's own family) is imposed as an automatic result of a qualifying conviction. The trial court has no discretion to exempt a parent nor is there any post-conviction opportunity, at any time, to petition the court or to otherwise seek relief. The prohibition lasts for life.

The Supreme Court has previously held that a father is entitled to an individualized hearing before being deemed unfit to be a custodial parent. *Stanley*, 405 U.S. at 650. Under *Stanley*, when stripping a parent of their fundamental right to the custody of their children, the state may not substitute a single fact about the parent for a hearing in which the state bears the burden of proof to demonstrate that the parent is unfit. *See id.* But that is exactly what ALA. CODE § 15-20A-11(d)(4) does – substitute the fact of conviction for an individualized determination of "unfitness". Even more egregiously, Alabama law does not even allow the parent to seek relief from the prohibition.

---

[4] Plaintiff has not raised an independent procedural due process claim in this case and is not attempting to do so here. However, that the challenged statute lacks due process protections is relevant to the determination whether the statute is appropriately tailored. As discussed further *infra*, under strict scrutiny, if procedural due process protections <u>could be</u> offered, then the statute in not "narrowly tailored." *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 814 (2000) ("[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.").

The statute also suffers from vagueness.[5] A criminal statute is constitutionally unsound if it either (1) fails to provide people of ordinary intelligence with fair notice of what conduct it proscribes, or (2) is so unclear that it authorizes or encourages discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In ordinary parlance, one's "residence" – the place where one "resides" – is "the place where one actually lives." *Residence*, BLACK'S LAW DICTIONARY (7th ed. 1999); *see also Reside*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (defining "reside" as "to dwell permanently or continuously"). Under the statute, however, "reside" is redefined as being "habitually or systematically present at a place." ALA. CODE § 15-20A-4(20). While the statute contains examples of what it means to be "habitually or systematically" present, these examples are specifically non-exclusive, and the statute contains no definition (or limitation) of "place."

This creates non-hypothetical confusion. In this case, Mr. Henry's probation officers recommended to him that he could largely avoid the statute by living in a shed located behind his house – that is, they interpret "place" as the actual house but not the premises. Exhibit 2 at pp. 18, 30, 50. But as "place" is itself not so

---

[5] As with procedural due process, Plaintiff has not brought an independent vagueness challenge and does not seek to do so here. Again, though, that the statute lacks appropriate constraints on law enforcement discretion, and is thus subject to *ad hoc* expansive interpretation, is relevant to the question whether the statute is appropriately tailored.

limited, other law enforcement officials might well have a different view – creating a situation in which an action approved by one's probation officer is considered a felony by Alabama law enforcement.[6] At the same time, given that the statute's list of examples is non-exclusive and contains no reference to the residence <u>of the</u> <u>child</u>, the statute appears to potentially encompass any situation where the parent is "habitually or systematically present" with their child regardless of location or the duration of the visit – regularly attending church as a family could be the basis for prosecution.[7]

## V. Harms to Third Persons

The statute also causes injury to others. Mr. Henry's child too has a right to family. *See Moore v. East Cleveland*, 431 U.S. 494, 496–98 (1977) (plurality opinion). More concretely, separation of a parent and child has significant deleterious effects on the child's development. As Dr. Burkhart puts it: "Absence of a father causes negative developmental consequences . . . in interpersonal relationships, academic performance, psychiatric status, delinquency and social status, health status, economic outcomes, and in practically every social and

---

[6] If, in fact, the statute would allow Mr. Henry to live in a shed in the backyard while his wife and child live in the main house, it becomes difficult to discern even a rational basis for the prohibition.

[7] The statute defines "reside" as to be "habitually or systematically present at a place" and the prohibition is that the parent may not "reside" "with the child." *See* Ala. Code §§ 15-20A-4(20) and 15-20A-11(d)(4). A natural reading is that the statute prohibits being present with the child in any sort of systematic or habitual way.

11

psychological metric used to measure quality of functioning in human beings." Exhibit 8 at p. 11. The effect of parental separation is "cumulative" and "aggregate over the lifetime of the child." *Id.*

In light of these effects, "[t]here is solid consensus in the field of developmental psychology that legally imposed separation of a child from a parent must not be done unless there is a high probability that the child is in imminent peril." *Id.* at p. 10. "The data on the detrimental effects of parental deprivation are so clear and powerful that maintaining the family as an intact unit is the goal of every care and welfare system designed to provide support and care to families in need or crisis." *Id.* Dr. Burkhart, considering the risk posed by an individual (such as Mr. Henry) convicted only of a non-contact pornography offense, concludes that "the mandate to separate the parent from the child as a matter of course, and not fashioned by a cautious and critical judgment, is ill-advised and simply meritless." *Id.* at pp. 12–13.

Mrs. Henry's rights are also abridged. She is forced to choose between living with her husband and living with her own child – or living with her husband and foregoing motherhood altogether. This places her in an untenable position. Exhibit 10 at pp. 97:11–100:7. As Mrs. Henry testified, she is not sure that her marriage can survive if Mr. Henry remains subject to the statute. *Id.* at 100:4–7.

## VI. Standard of Review and Burden of Proof

In light of these constitutional harms, ALA. CODE § 15-20A-11(d)(4) must "withstand strict scrutiny." *See Doe v. Strange*, No. 2:15-cv-35161, 2016 WL 1079153, at *13 (M.D. Ala. Mar. 18, 2016) (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993)); *see also Herring v. State*, 100 So. 3d 616, 622–25 (Ala. Crim. App. 2011) (concluding that residency restriction in earlier version of ASORCNA was subject to strict scrutiny). To do so, the challenged statute must be "narrowly tailored to serve a compelling state interest." *Reno*, 507 U.S. at 302; *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005). That is, the statute must (1) advance the government's stated interest and (2) be the least restrictive means of doing so. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (under strict scrutiny, government must "choose[] the least restrictive means to further the articulated interest"). If less restrictive means are available, the government must use them. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 814 (2000). Defendants bear the burden of proving each of these prongs. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). (under strict scrutiny, government must prove that the law is "narrowly tailored to serve a compelling government interest"). Defendants bear this burden at the summary judgment stage. *Bazemore v. Jefferson Capital, Sys., LLC*, 827 F.3d 1325, 1334 (11th Cir. 2016) ("[E]ntry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to

establish the existence of an essential element of the party's case, and on which the

party will bear the burden of proof at trial.'") (quoting *Celotex*, 477 U.S. at 322).

## VII. Question Presented

Under ALA. CODE § 15-20A-11(d)(4), any person convicted of any sex

offense against a child (defined to include any child pornography offense),

regardless of individual circumstances and without opportunity for relief, is subject

to a lifetime prohibition from living with their own children and, in many cases,

their own spouse. Under the statute, there is literally nothing a parent can do to

demonstrate that they should be allowed to live with their child.

The question in this case is whether the State can show that the fact of such

conviction is itself indicative of such dangerousness to the parent's own children

that in no circumstances can the parent ever be allowed to live with them (or even

spend more time with them than allowed by the statute).

It cannot. [8]

---

[8] As noted in this Court's earlier rulings, even in the context of setting conditions of supervised release, courts have consistently "rejected arguments that a defendant's sex conviction, standing alone, was sufficient to justify limiting the defendant's contact with their own children – even when the supervised release term was for a single-digit term of years. Doc. 62 (citing *United States v. Bear*, 769 F.3d 1220, 1229 (10th Cir. 2014); *United State v. Quinn*, 698 F.3d 651, 652 (7th Cir. 2012) (Easterbrook, C.J.); *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006); *United States v. Del Valle-Cruz*, 785 F.3d 48, 51–52, 62–63 (1st Cir. 2015); *United States v. Worley*, 685 F.3d 404, 408 (4th Cir. 2012); *United States v. Volker*, 489 F.3d 139, 154–55 (3d Cir. 2007)).

## VIII. The Risk Posed by Persons Convicted of a Sex Offense

### A. General Risk

For sex offenders as a class, the rate of sexual recidivism in the United States is 3-6% over three years. [9] Exhibit 11 at p. 5. This means that in the first three years after release, 3-6% of all persons convicted of a sexual offense will be rearrested or reconvicted for a new sexual offense. *Id.* at p. 4. Over longer follow-up periods, the total number of recidivistic acts will increase, but the <u>rate</u> of recidivism continues to decrease. Exhibit 12 at pp. 73:15–74:9. That is, for individuals who have been living offense free in the community for five (5) years, a much smaller percentage will later recidivate. Exhibit 13 at pp. 38–41. Exhibit 14 summarizes the federal research in this area – showing that after approximately ten (10) years the risk of sexual recidivism for a prior sexual offender becomes the same as the risk of a sexual crime committed by an offender with no prior sexual offense. As discussed in more detail later, once a sexual offender has been offense-free in the community for a certain time, their individual risk of committing a new sex offense is the same as the risk of someone with any criminal conviction committing a new sex offense – that is, someone previously convicted of possession of child pornography and someone previously convicted of larceny

---

[9] "Sexual Recidivism" is defined as rearrest or reconviction of a new sexual offense committed after having been arrested or convicted for a prior sexual offense. Exhibit 11 at p. 4.

have the same risk of committing a future sexual offense . Exhibit 13 at pp. 40–41; Exhibit 14. Thus, "the mere fact of conviction is, generally, a very poor proxy for future risk." Exhibit 8 at p. 7.

### B. Risk Posed by Child-Pornography Offenders

There are profound differences in the risk posed by different subgroups of sexual offenders. Exhibit 9 at p. 7. As a subgroup, persons convicted of a child pornography offense "comprise a meaningfully different subgroup of individuals . . . and are at lower risk to reoffend – having an overall sexual recidivism rate between 1.4% and 4.6% over three (3) to five (5) years. Exhibit 11 at p. 5. The rate at which child pornography offenders go on to commit <u>contact</u> sex offenses (of any kind, not just against children and not just against their own children) is 1%-2% over a follow-up period of four point 8 (4.8) to nine (9) years. *Id.* at p. 5; Exhibit 12 at pp. 80:16–84:6; Exhibit 8 at p. 9; Exhibit 9 at p. 6 ("[R]eoffending with a contact sexual offense among CP-only offenders is uncommon (approximately 1.4%).").[10]

_____

[10] The studies relied upon by Dr. Hersh and Dr. Burkart (based on samples of American offenders and showing a contact sexual recidivism rate of 1% - 2% for child pornography offenders) generally do not differentiate between persons whose <u>only</u> sexual offense conviction is child pornography and persons who <u>also</u> have a contact sexual offense in their criminal history. Exhibit 11 at pp. 5–6; Exhibit 12 at pp. 80:22–82:16. When looking at international studies, Dr. Helmus finds a slightly higher rate for such "undifferentiated" samples – 2.7. Exhibit 9 at p. 7. As noted above, Dr. Helmus agrees that the baseline contact sexual offense recidivism rate for "child pornography only" offenders is well under 2%. *Id.* at p. 6.

### C. Time to Redemption

For criminal offenders of all types, risk of recidivism decreases with time offense free in the community. At his deposition, Defendants' expert Dr. DeLisi acknowledged that the studies he relies on in assessing the impact of a felony conviction on risk of future offending themselves show that after some period of time the fact of a prior felony conviction itself ceases to be a meaningful predictor of future risk. For instance, Dr. DeLisi relies on Kurlychek, *et al.*,[11] to posit that five years after arrest the risk of recidivism for the person arrested is 1% greater than the risk posed by a peer who had not been arrested. Exhibit 15 at pp. 116:17–118:11. However, Dr. DeLisi acknowledges that after a longer period of time (approximately 9 years), the risk of recidivism is indistinguishable between the two groups. *Id.* at pp. 119:22–122:2. Similarly, Dr. DeLisi also relies on Blumstein and Nakamura[12] – who write in the article cited by Dr. DeLisi: "Recidivism probability declines with time clean, so some point in time is reached when a person with a criminal record who remained free of further contact with the criminal justice

---

[11] Kurlychek, M.C., Brame, R., & Bushway, S.D., *Scarlet letters and recidivism: Does an old criminal record predict future offending?*, CRIMINOLOGY & PUBLIC POLICY, 5(3), 483, 498–99 (2006).

[12] Blumstein, A., and Nakamura, K., *Redemption in the presence of widespread criminal background checks*, CRIMINOLOGY, 47(2), 327 (2009) (no pinpoint cite provided in Dr. DeLisi's report).

system is of no greater risk than a counterpart of the same age." *Id.* at p. 125:4–13.

Plaintiff's expert Dr. Helmus has replicated this research specifically for sexual offenders.[13] Exhibit 9 at p. 13. She defines "time to redemption" as the time "after release from a sexual offense charge or conviction before a person's risk to sexually reoffend becomes indistinguishable from people in the criminal justice system without a conviction for a sexual offense." *Id.* at p. 14. As Dr. Helmus notes, "[i]f the risk of a sexual offense is no different than non-sex offenders in the criminal justice system, then there is no empirical basis for treating [a sexual offender] differently than someone in the corrections system for property offenses[.]" *Id.* at p. 13.

For persons convicted of a non-sexual offense, the rate of <u>sexual</u> recidivism over five (5) years is 1% to 2% – that is, 1% to 2% of individuals convicted of some other type of offense will go on to commit a sexual offense within five (5) years. *Id.* at p. 14. At the same time, "risk of sexual recidivism roughly halves for every 5 years that an individual is sex-offense free in the community following release." [14] *Id.* at p. 13. Thus, there comes a point at which the risk of recidivism

---

[13] As better data was available, Dr. Helmus compared sexual offenders with non-sexual offenders instead of sexual offenders with non-offenders. *See* Exhibit 9 at p. 13.

[14] A violation of a condition of supervised release does <u>not</u> affect this reduction in risk. Exhibit 9 at p. 13.

posed by a sexual offender becomes indistinguishable from the risk posed by a non-sex offender.

The "time to redemption" will depend on the initial recidivism risk of the individual. *See id.* at 14. For the lowest risk offenders, the time to redemption is zero – "on the day they are released from prison, the risk is sufficiently low, that they are indistinguishable from the general population." Exhibit 16 at pp. 185:1–187:9. Overarchingly, for sex offenders assessed to be "below average" risk (compared to other sex offenders), the time to redemption is three (3) to five (5) years. Exhibit 9 at p. 14. For offenders assessed as "average" risk (compared to other sex offenders), the time to redemption is approximately ten (10) years. *Id.*[15] As a subgroup, child pornography offenders are lower risk than "average" sex offenders. *Id.* at p. 5.

This case does not require the Court to determine the quantum of risk that might justify application abrogation of parental rights in an individual case. But the State lacks even a rational basis for abrogating the parental rights of a person convicted of a sexual offense who represents no greater risk to their child than a person never convicted of a sexual offense.

---

[15] This exactly matches the U.S. federal government finding that, for sexual offenders as a whole (*i.e.*, on "average"), the time to redemption for sexual offenders is approximately ten (10) years. *See* Exhibit 14.

### D. Reduction Through Treatment

Sexual recidivism is reduced by treatment. As Dr. Hersh states: "Meta-analyses that examine the effect of treatment completion on recidivism rates indicate significant reductions in recidivism – as high as a 32.6% reduction among adult male sex offenders." Exhibit 11 at p. 6. At deposition, Dr. Hersh clarified that 32.6% was the reduction, on average, found by studies looking at the effect of treatment on sexual recidivism. For programs overseen by a clinical psychologist, the number is even higher. Exhibit 12 at pp. 157:23–160:7.

### E. The Effect of Unreported Sexual Offenses

Not all instances of sexual crime are reported. This is true of all crime. So too, there will be some instances of unreported sexual crime committed by persons who have previously been convicted of a sexual offense. This fact, though, does not meaningfully impact the analysis above.

### i. The Prolific Offender

"General criminology research finds that a small proportion of offenders tend to be responsible for a disproportionately large number of offenses." Exhibit 9 at p. 19. This is true for undetected offenses as well. *Id.* Accordingly, information about the average (or "mean") number of unreported offenses as gathered by victim surveys or the average number of undetected crimes self-reported by

offenders tells us nothing about whether a given individual has a meaningful unreported history.

Further, to the extent undetected prior criminal activity is important to assessing the risk for <u>future</u> criminal activity,[16] Defendants' expert Dr. DeLisi agrees that such prior undetected activity can be discovered through investigation, treatment, polygraph, and the like once an individual is convicted and under court supervision. Exhibit 15 at pp. 168:12–170:2. Someone who <u>in fact</u> has a meaningful history of undetected offenses (sexual or otherwise) can be identified and placed under controls appropriate to their risk.

### ii. No Effect on Time to Redemption

That some offenses committed after conviction might go undetected has no impact on the finding that an individual's risk of committing a sexual crime decreases over time to the point where it is indistinguishable from an offender with no sexual crime in their history. As Dr. Helmus notes, the research on "time to redemption" compares the <u>observed</u> recidivism rate for sexual offenders and non-sexual offenders. Exhibit 9 at p. 17. Time to Redemption (and thus the time after which there is no rational basis to treat sex offenders and non-sex offenders

---

[16] Research shows that, as a predictive factor for future recidivism, "it's better to count the number of sentencing occasions rather than the number of offenses/victims/charges." Exhibit 16 at pp. 188:10–190:6. This is so because "there is an important psychological difference between committing an offense and never getting caught for it and then how you behave after you've been caught for something." *Id.* at p. 159:1–11.

differently) is not affected by undetected sexual crimes unless the <u>detection</u> rates

for sex offenders and non-sex offenders are different – that is, unless persons with

a prior sexual offense conviction "get away with" sexual offenses more often than

people without a prior sexual offense conviction. *Id.* There is no research

supporting the proposition that a person with a prior sexual offense conviction is

more able to avoid detection for sexual offenses than someone without a prior

sexual offense conviction. *Id.* If anything, the reverse is true. As Dr. Helmus notes,

"after conviction it's a lot more difficult to evade detection." Exhibit 16 at p.

171:5–171:8. Thus, the time to redemption is likely <u>shorter</u> than Dr. Helmus'

research indicates. Exhibit 9 at 17.

### iii. Research Not Applicable

The research on undetected sexual offenses is not germane to the risk of

sexual recidivism. The research looks exclusively at undetected offenses that occur

<u>prior to</u> the individual's first conviction for a sexual offense or is collected from

individuals with no criminal history.[17] These rates (which themselves are skewed

due to prolific offenders) cannot be used to predict the rate of undetected sexual

crimes that occur <u>after</u> conviction. Exhibit 9 at p. 18; Exhibit 7 at 189:3–22. The

rate of <u>post-conviction</u> sexual crimes that go undetected "is meaningfully less than

---

[17] Much of this research is also quite old (25+ years). Rates of reporting have increased
dramatically. Exhibit 16 at pp. 181:12–182:9; Exhibit 12 at pp. 105:3–106:19.

the rate of unreported sexual offenses among offenders who have never been detected." Exhibit 9 at p. 18; *see also* Exhibit 7 at p. 189:19–22 (rate of undetected offenses post-conviction is "low").[18]

### iv. The Rate of Undetected Child Sexual Abuse

Federal research shows that reporting of child sexual abuse has increased dramatically in the last decades. Exhibit 16 at pp.76:1–77:17. As Defendants' expert Dr. DeLisi acknowledges, research shows that 76% of child sexual abuse by a nonspecific adult and 69% of sexual abuse by a known adult becomes known to authorities. Exhibit 15 at pp. 188:4–190:2; *see also id*. at p. 159:3–19 (acknowledging that study relied upon found no undetected recidivism among child pornography offenders). These findings are confirmed by Dr. Helmus. Exhibit 16 at pp. 181:12–182:9; *see also* Exhibit 12 at pp. 105:3–106:19 (noting social changes resulting in increased reporting). As noted above, these detection rates are likely to be even higher when the sexual abuse is committed by someone with a previous sexual offense.

---

[18] As Dr. Helmus notes, available research indicates that "when predicting recidivism, it is better to count the number of sentencing occasions rather than the number of offenses/victims/charges." Exhibit 9 at p. 22; Exhibit 16 at pp. 188:10–190:6 ("[W]hat is the likelihood of them reoffending. . . it's better to count the number of sentencing occasions they have rather than the number of victims.").

### v. Conclusion

Most undetected sexual offenses are committed by an identifiable subgroup of offenders. These individuals can be identified once detected and placed under appropriate controls. At the same time, the fact that there are undetected sexual offenses does not affect the finding that the risk of recidivism for sex offenders reduces over time to the point where that risk is indistinguishable from someone with no sexual offense in their record. For low-risk offenders, like child pornography offenders as a class, the time to redemption is about five (5) years (though it will be lower in individual cases). For the "average" sex offender, it's about ten (10) years.

The research on undetected sexual offenses does not show there is such a significant amount of undetected sexual recidivism that the fact of conviction is a meaningful proxy for individual risk – and says nothing about the risk of a parent to their child.  Regarding child sexual abuse specifically, the evidence in this case is that most offenses will be reported.

### IX. Risk Assessment of Persons Convicted of Sexual Offenses

Clinical practitioners assess the risk of an individual using risk assessment tools and evaluating the presence of recognized risk and protective factors. A given risk assessment tool may be an "actuarial risk-assessment instrument" in that it provides a numerical estimate of the risk of a given individual. Exhibit 17 at p.

17:4-18; Exhibit 7 at p. 178:1–10. A given score on the instrument correlates to a given numerical risk of sexual recidivism. *Id.* Risk-assessment tools may also be used to assess an individual's relative risk – where that individual "ranks" with regard to others in the same category. *Id.* at pp. 178:1–180:1; Exhibit 9 at p. 28. Thus, if one knows the baseline risk associated with a subgroup of sexual offenders (for instance, 1%-2% for child pornography offenders), this ranking assesses whether the given individual presents a risk higher, lower, or within that range. *Id.*; Exhibit 7 at p. 179:8–13; *see also* Exhibit 12 at p. 108:1–21. Additional information is provided by examining the complete criminological and social history of the individual. Exhibit 18 at pp. 6–7; Exhibit 15 at pp. 134:15–138:7.

Courts and agencies at both the federal and state level routinely conduct risk assessments of persons convicted of sexual offenses and use these assessments in making treatment and supervision decisions. For federal courts, such assessment is a standard condition of supervised release for all persons convicted of a sex offense. Admin. Office of the U.S. Courts Probation and Pretrial Services Office, *Overview of Probation and Supervised Release Conditions*, Ch. 3 § 18 (Nov. 2016), available at *https: https://www.uscourts.gov/services-forms/overview-probation-supervised-release-conditions* (last visited Mar. 27, 2023).

In Alabama, risk assessments are required for all juvenile sex offenders. ALA. CODE § 15-20A-26(b). These risk assessments are used to determine whether

the juvenile remains subject to court supervision and what provisions of ASORCNA[19] will apply to them.[20] ALA. CODE § 15-20A-26(e). For adult sex offenders, Alabama law requires a risk assessment as part of the determination whether someone is to be labelled a "sexual predator" (*see* ALA. CODE § 15-20A-19(b)) and whether someone may be relieved of the residency restriction imposed by § 15-20A-11(a). *See* ALA. CODE § 15-20A-23(g). More generally, state-level probation and parole officers routinely seek risk assessments of sexual offenders. Exhibit 6 at p. 2; Exhibit 5 at pp. 290:12–291:14.

Risk assessments are used throughout the country to make decisions about sex offender supervision, including whether someone will be subject to public registration (*see, e.g.*, N.Y. CORRECT. § 168-l 6(a)-(c) (2019); R.I. GEN. LAWS § 11-37.1-11(5) (2022)), whether someone will be relieved of registration requirements (*see, e.g.*, S.C. CODE ANN. § 23-3-463(3)(E)-(F) (2022); N.C. GEN. STAT. § 14-208.12A(a1)(3)); and the terms of release (*see, e.g.*, GA. CODE ANN. § 42-1-14(2) (2021)).

---

[19] The Alabama Sex Offender Registration and Community Notification Act. ALA. CODE § 15-20A-1 *et seq.*

[20] Dr. Burkhart, an expert witness in this case, was on the team that developed the risk assessment used by Alabama courts for juvenile sexual offenders. Exhibit 8 at pp. 41:22–44:18.

As noted *supra*, for persons convicted of child pornography offenses, the "baseline" rate for any sexual recidivism is 1.4% and 4.6%.[21] The rate of recidivating by committing a <u>contact</u> sex offense is 1%-2%. Exhibit 11 at p. 5; Exhibit 12 at pp. 83:16–84:6; Exhibit 8 at p. 9; Exhibit 9 at p. 6. Against this baseline risk, there are risk assessment instruments that can assess the relative risk of persons convicted of a child pornography offense. Exhibit 9 at pp. 30–31. In addition, there are tools (such as the ROSAC[22]) which are not risk assessment tools *per se*, but that compile recognized risk factors to enable a clinician to evaluate the risk an individual poses to a particular child and to formulate an appropriate safety plan. *See* Exhibit 9 at p. 24; Exhibit 7 at pp. 175:10–22. These tools are commonly used by clinical practitioners. Exhibit 19 at p. 3. These tools, along with review of other individualized factors, allow a clinician to assess the risk of an individual. Exhibit 15 at pp. 134:11–138:7; Exhibit 9 at p. 32; Exhibit 18 at pp. 6-7; Exhibit 7 at pp. 191:3-193:18.

---

[21] These numbers come from studies with a follow-up period of three (3) to five (5) years. Exhibit 11 at p. 5. As noted *supra*, while some individuals will recidivate after a given follow-up period, the <u>rate</u> of recidivism continues to decrease (by roughly half for every five years). So, after five years, the <u>rate</u> of future sexual recidivism (of any type) among all persons convicted of a child pornography offense will be between less than 1% and 2% or so. *See* Exhibit 9 at p. 13; Exhibit 14.

[22] Risk of Sexual Abuse of Children.

## X. Risk Posed by Mr. Henry

The individualized risk that might be posed by Mr. Henry is irrelevant under the statute. To the extent Defendants argue that there are particular features of Mr. Henry's background, treatment, sexuality, conduct on supervised release, or even his specific offense conduct which show he is "dangerous," they are proving the point – that the fact of conviction alone is insufficient to justify the statute's severe abrogation of parental rights. If Defendants need to show that Mr. Henry (individually) is dangerous, then the statute necessarily fails strict scrutiny. Denial of parental rights because of membership in a class is not "narrowly tailored" if the fact of membership alone is not sufficient to justify such denial.

As shown above, the fact of Mr. Henry's conviction for possession of child pornography, standing alone, indicates that when he was released from prison he presented a 1% – 2% risk of committing a contact sexual offense within five years. That initial risk is now halved as he has not committed such an offense in the five years since he was released.[23] Exhibit 9 at 31. Absent other information, Mr. Henry's current risk of committing a contact sexual offense against anyone, much less his own child, is 1% or less – a rate not appreciably different than that posed by an individual with no sexual offense history. Whatever the quantum of risk that

---

[23] As noted above (n. 14), violations of supervised release do not affect "time to redemption."

might justify application of ALA. CODE § 15-20A-11(d)(4) it is surely higher than that.[24]

Even if Mr. Henry's individualized risk were relevant at this stage of the proceedings, Defendants bear the burden of proof on the issue – which they cannot meet. *Reed*, 576 U.S. at 163. Defendants have never sought to evaluate Mr. Henry nor have they enlisted an expert or other witness competent to perform a risk assessment or to testify about Mr. Henry's risk of recidivism.[25] Mr. Wells concludes that Mr. Henry has no cognizable risk to harm his own child. Exhibit 5 at pp. 284:10–285:13. Dr. Burkhart finds that Mr. Henry's risk of recidivism is "below one percent." Exhibit 7 at p. 193:19–22. And Dr. Helmus finds that Mr. Henry's risk "may not be appreciably different from the general population of men, or of non-sex offenders." Exhibit 9 at 32.

---

[24] Even if a risk of 1% or less was sufficient to justify barring Mr. Henry from living with his wife and son, the statute would still not be "narrowly tailored." Mr. Henry's risk will only go down from here and, as discussed *infra*, the State has numerous, less restrictive alternatives to mitigate residual risk.

[25] While Defendants' expert Dr. DeLisi has offered the opinion that Mr. Henry has some risk factors associated with increased risk of recidivism, Dr. DeLisi is a criminologist unqualified to assess Mr. Henry's individual risk of recidivism. *See* Doc. 62 at 22–23. Even if he were, Dr. DeLisi has also consistently stated that to assess individualized risk, it is necessary to review the individual's full criminological profile. *See, e.g.*, Doc. 33-4 at pp. 3–4; Exhibit 15 at pp. 134:11–138:7, 154:6–20.  However, either Dr. DeLisi has not done so or he has chosen not to supplement his report after having received all of the records requested. *Cf.* Doc. 76-1 (Order Granting Access to Requested Records).

## XI. The Statute Does Not Meet Strict Scrutiny

To survive strict scrutiny, the government must demonstrate that ALA. CODE § 15-20A-11(d)(4) <u>both</u> advances a compelling government interest and is narrowly tailored – that is, that the statute uses the "least restrictive means" available. *Sable Commc'ns of Cal.*, 492 U.S. at 126.

As to the first prong, while it is true that the Alabama legislature has stated that "employment and residence restrictions" "further[] the interests of protecting vulnerable populations, particularly children,[26]" this legislative judgment is not owed the usual deference when reviewing a statute that involves intrusive regulation of the family. *Moore*, 431 U.S. at 499. In such cases, the court must "examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged statute." *Id.*

While Plaintiff acknowledges that protecting children from sexual abuse is a compelling government interest, Defendants in this case have offered no actual evidence that the statute in fact advances that interest. There is no evidence that rates of child sexual abuse have gone down or that sexual recidivism has decreased since the statute was passed. At this stage of the proceedings, Defendants may not rely on conclusory allegations or speculation that the statute protects children by

---

[26]ALA. CODE § 15-20A-2(5)

severely limiting the amount of time a parent can spend with their child and preventing any "overnight visits." *See Cordoba*, 419 F.3d at 1181 (non-movant may not rely on conclusory allegations or speculation to defeat summary judgment). It is equally plausible that by preventing the offender from living with his family (and thereby disrupting his (or her) social support), the statute exacerbates the risk factors for sexual recidivism and does not ultimately "protect children." *See* Exhibit 7 at p. 128:17–22 (strong family ties a protective factor); *see also* Exhibit 15 at pp. 137:18–138:2 (acknowledging marriage as a protective factor against sexual recidivism).[27] What is clear though, is that parental separation actively harms children. Exhibit 8 at 11–12.

As to the second prong, even in the context of imposing conditions of supervised release – which are time-limited, can be modified based on changed circumstances, and are appealable – "a court may not categorically [impose a condition limiting access to one's own children] in every child pornography case that comes before it; since the relevant statutory and constitutional considerations look to whether the condition is more restrictive that what is needed to satisfy a governmental interest in a specific case; the district court must decide whether to impose such a condition based on specific facts." *United States v. Davis*, 452 F.3d

991, 995 (8th Cir. 2006); *see also United States v. Del Valle-Cruz*, 785 F.3d 48, 51–51, 62–63 (1st Cir. 2015) (improper to categorically limit access to one's children based upon a conviction for failure to register as a sex offender). Unless Defendants can prove that <u>all</u> persons convicted of a child pornography offense are *ipso facto* so dangerous as to require a lifetime ban on residing with their own children, the statute – which is not time-limited and offers no appeal – is not "narrowly tailored." *See Stanley*, 405 U.S. at 653 (the State has no legitimate interest in separating families without an individualized hearing to determine the fitness of the parent).

Most obviously, the statute could be more narrowly drawn by requiring an individualized hearing on the issue of dangerousness and the appropriateness of applying § 15-20A-11(d)(4) in a particular case. In fact, given the primacy of the right to familial integrity, *Stanley* strongly suggests that such a hearing is constitutionally required prior to such a drastic abrogation of parental rights. *See Stanley*, 405 U.S at 653.[28] Short of that, at an absolute minimum, the State could provide a mechanism by which the affected offender could challenge the presumption that residence with their own children is unsafe.

---

[28] If the State is concerned that a parent represents a danger to their own child, there is an existing mechanism to seek termination or limitation of parental rights. *See generally* ALA. CODE § 12-15-301 *et seq.* At such hearing, the relevance of a prior felony conviction shall be considered. *Id.* § 12-15-319(a)(4).

Alternatively, the State could impose appropriate restrictions on parental rights as part of probation and parole rather than through statutory fiat. The State could limit the residency restriction to a term of years commensurate with the "time to redemption." The State could remove child pornography offenders (which, as a subgroup, have the <u>lowest</u> risk of recidivism) from the class of persons covered by the statute. The State could allow residence when the offender meets certain criteria (such as completion/participation in a treatment program). The State could allow residence under certain conditions (such as a separate, qualified caregiver residing in the home or ongoing supervision by Alabama's Department of Human Resources). That an offender meets such criteria or that such conditions are present can be confirmed through the existing sex offender registration program. *See, e.g.*, ALA. CODE § 15-20A-10 (requiring registrants to provide information to law enforcement).

In short, there are myriad ways the State could more narrowly tailor the challenged statute.

## XII. Equal Protection

On its face, ALA. CODE § 15-20A-11(d)(4) creates two classes of persons: 1) child pornography offenders (who are not allowed to reside with their children) and 2) persons who have been convicted of other sexual offenses (who are allowed to live with their children). In light of the burdens the statute places on

fundamental First and Fourteenth Amendment, this classification is itself subject to strict scrutiny review. *Moore*, 410 F.3d at 1346 ("[G]roup classification by legislative act will be analyzed under strict scrutiny if the classification infringes fundamental rights or concerns a suspect class.") (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).[29] Such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440.

Strict scrutiny analysis under the Equal Protection Clause requires the <u>government</u> to prove that the classification is "necessary to promote a compelling government interest." *Dunn. v. Blumstein*, 405 U.S. 330, 342 (1972); *see also Johnson v. Mortham*, 915 F. Supp. 1574, 1576 (N.D. Fla. 1996) (collecting cases). The State bears a "heavy burden of justification." *Dunn*, 405 U.S. at 343. The classification must be drawn with "precision" and must be "tailored" to serve the government's legitimate objectives. *Id.* If there are "less drastic means" available, the State must choose them. *Id.*

In this case, the classification drawn is not "narrowly tailored" because it is

---

[29] Heightened review of classifications involving "suspect classes" is motivated, at least in part, by recognition that discrete groups subject to "prejudice and antipathy" are often unable to rectify discrimination through the legislative process. *See City of Cleburne*, 473 U.S. at 440. While sex offenders are not a legally recognized "suspect class," those same concerns counsel heightened concern when reviewing legislation that strips fundamental rights from sex offenders convicted of a child pornography offense.

substantially overinclusive. As a class, persons convicted of child pornography offenses recidivate at a <u>lower</u> rate than other subgroups of sex offenders. Exhibit 11 at 5. The vast majority of individuals within the group will not go on to commit a contact sex offense – against their own child or otherwise. Exhibit 11 at p. 5; Exhibit 12 at pp. 83:16–84:6; Exhibit 8 at p. 9; Exhibit 9 at p. 6 ("[R]eoffending with a contact sexual offense among CP-only offenders is uncommon (approximately 1.4%)."); *see also* Exhibit 8 at p. 10 ("A statute which prevents all persons convicted of a "sexual offense against a child" (including child pornography) is grossly overbroad as most such persons convicted of such crimes do <u>not</u> pose a meaningful risk of harm.") (emphasis in original). And, within the class, individual child pornography offenders may have substantially lower risk than the average class member. Exhibit 7 at pp. 191:8–193:1.

Further, specifically with regard to the risk to children if a parent resides with them, the State has produced no evidence upon which to compare that risk between the two groups created by the challenged classification. Nor has the State produced evidence that the classification is "necessary" to protect children. As noted above, there is no evidence that rates of child sexual abuse have gone down or that sexual recidivism has decreased since the statute was passed. Without such evidence, the State cannot meet its burden of showing that the classifications even serve the government's interest, much less that they are "precisely tailored" to do so.

## XIII. Conclusion

The right to the care, custody, and control of one's children is "the oldest of the fundamental liberty interests." *See Troxel* 520 U.S. at 65. The inviolability of familial integrity is so fundamental to our constitutional scheme that it is protected by three separate provisions of the Constitution – the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause. The right of parents to live with their children is so basic that the Constitution almost certainly forbids abrogation of that right without an individualized hearing at which the State must prove the parent's unfitness. *See Stanley*, 405 U.S. at 649.

Nevertheless, ALA. CODE § 15-20A-11(d)(4) takes a single fact – conviction for any "sex offense against a minor" (including possession of child pornography) – and uses it to impose a lifetime, non-appealable ban on residing with one's own children and family. There is no evidence that such a total ban in fact makes children safer. There is no evidence that the members of the class created by the statute are *ipso facto* so dangerous that the State has no other choice. There is, in short, no evidence upon which to conclude that this statute meets the exceedingly heavy burden necessary to justify the severe abrogation of such a basic right.

"Rules that allow public officials to regulate family life . . . call for special justification, and lifetime regulatory power is hard to support when the defendant

has not been convicted of crimes against his family or other relatives." *Quinn*, 698

F.3d at 652 (Easterbrook, C.J.). In this case, that justification does not exist.

Respectfully submitted this 31st day of March 2023.

/s/ Algert S. Agricola, Jr.
Algert S. Agricola, Jr.
Barbara H. Agricola

*Counsel for Plaintiff*

**OF COUNSEL:**

Agricola Law, LLC
127 South 8th Street
Opelika, Alabama 36801
334-759-7557 (voice)
334-759-7558 (fax)
al@agricolalaw.com
barbara@agricolalaw.com

/s/ Paul Dubbeling
Paul Dubbeling

Paul M. Dubbeling, PLLC
210 North Columbia Street
Chapel Hill, NC 27514
(919) 635-6005 (voice)
(919) 404-7074 (fax)
paul.dubbeling@pmdubbeling.com
NC Bar # 47014
*Admitted Pro Hac Vice*

37

CERTIFICATE OF SERVICE

The is to certify that the undersigned has this date electronically filed the foregoing **Brief in Support of Plaintiff's Motion for Summary Judgment** with the Clerk of Court using the Court's CM/ECF system, which will send notice to all parties of record in this case.

This is the 31st day of March 2023.

/s/ Paul Dubbeling
Paul Dubbeling

Paul M. Dubbeling, PLLC
210 North Columbia Street
Chapel Hill, NC 27514
(919) 635-6005 (voice)
(919) 404-7074 (fax)
paul.dubbeling@pmdubbeling.com
NC Bar # 47014
*Admitted Pro Hac Vice*